UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

In re:                                              :
                                                    :
ARIEH J. WHITE and GEMMA S. WHITE,                  :       Chapter 7
                                                    :       Case No.: 12-11847 (SMB)
                              Debtors.              :
----------------------------------------------------------------X
BEACH LANE MANAGEMENT, INC., as                     :
agent for 16-26 East 105 LLC,                       :
                                                    :
                              Plaintiff,            :
                                                    :
         – against –                                :       Adv. P. No. 13-01108
                                                    :
ARIEH J. WHITE and GEMMA S. WHITE,                  :
                                                    :
----------------------------------------------------------------X

### POST-TRIAL FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

GOLD BENES, LLP
Attorneys for Plaintiff
1854 Bellmore Avenue
Bellmore, NY 11710

       Melissa B. Levine, Esq.
         Of Counsel

REICH, REICH & REICH, P.C.
Attorneys for Defendants
235 Main Street, Suite 450
White Plains, NY 10601

       Lawrence R. Reich, Esq.
       Nicholas A. Pasalides, Esq.
         Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Beach Lane Management, Inc., as agent for 16-26 East 105 LLC (the "Plaintiff"),

commenced this adversary proceeding objecting to the discharge of the debtors, Arieh J. White

("Arieh") and Gemma S. White ("Gemma," and collectively with Arieh, the "Defendants").  The

Court conducted a trial over four days, heard the testimony of the Defendants, and received

thousands of pages of documents relating to the Defendants' finances.  Having heard the

Defendants' testimony and considered the documentary evidence at length, the Court concludes

for the reasons that follow that judgment will be entered dismissing the complaint as to Arieh

and denying a discharge as to Gemma.

## BACKGROUND[1]

The Defendants are spouses who, at the time of trial in 2014, had three small children

ages three, six and sixteen months.  (Tr. (3/20) at 3:15-20.)  Each of the Defendants conducts a

business.  Arieh is an officer and the sole shareholder of Got Cholent? Inc. a/k/a/ Gemstone

Catering ("Got Cholent"), a New York corporation organized in June 2009.  (*JPTO* ¶¶ 3-5.)  Got

Cholent provides kosher catering services and other food-related services to synagogues on a

weekly basis and caters both small and large events including weddings and bar mitzvahs.  (Tr.

(3/20) at 64:13-65:10; Tr. (9/15) 44:9-10.)  His duties with Got Cholent include chef, sales

representative, truck driver and any other job necessary to operate the business on a daily basis.

---

[1]    The Plaintiff's exhibits are cited as "PX" and the Defendants' exhibits are cited as "DX."  The trial transcripts are cited as "Tr." with a parenthetical notation that identifies the date of the proceedings, all occurring in 2014, followed by the page and line.  For example, "Tr. (3/20) at 15:4-7" refers to the transcript of March 20, 2014 at page 15 lines 4 through 7.  In addition, the parties stipulated to fifty facts in Part III of the *Joint Pre-Trial Order*, dated Jan. 28, 2014 ("*JPTO*") (ECF Doc. # 22).  The stipulated facts are cited by the paragraph number in Part III.  Thus, "*JPTO* ¶ 4" refers to paragraph four in Part III of the *JPTO*.  Citations to other parts of the *Joint Pre-Trial Order* follow the form "*JPTO, Pt. __ at __.*"

(Tr. (5/08) at 12:19-20.)  Prior to opening Got Cholent, Arieh owned a business called "Arieh's Deli," and before that he helped to start a couple of other businesses.  (Tr. (3/20) at 62:14-19.)

Gemma is a speech language pathologist specializing in autism and feeding disorders. (*JPTO* ¶ 7.)  She is the sole shareholder and officer of A Spoonful of Sugar Inc. ("Spoonful"), through which she has provided speech pathologist services to her patients since March 2009. (*JPTO* ¶¶ 10-11.)  She received a Bachelor of Science degree from University College of London and earned a graduate degree in Applied Behavioral Science from University of North Texas. (*JPTO* ¶¶ 8-9.)

On June 6, 2007, the Plaintiff recovered a money judgment against the Defendants in the amount of $108,441.86 (the "Judgment").  (*JPTO* ¶ 12.)  It subsequently tried, without success, to obtain information to enforce the Judgment.  Arieh and Gemma ignored information subpoenas accompanied by questions.  (*JPTO* ¶¶ 13-15, 17-18, 23.)  Arieh also ignored an execution and garnishment seeking the turnover of his Got Cholent shares.  (*JPTO* ¶ 16.)  The Plaintiff obtained an order from the state court compelling Arieh to comply, and when he failed to obey the order, the state court held him in contempt and issued a warrant directing the Sheriff to produce Arieh in court.  (*JPTO* ¶¶ 19, 21, 22.)

The Defendants filed this chapter 7 case on May 2, 2012, (*JPTO* ¶ 24), approximately one week after the state court issued the bench warrant.  The Plaintiff filed a timely Proof of Claim in the amount of $156,304.83.  (*JPTO* ¶ 25.)  The Plaintiff also filed a complaint objecting to the Defendants' discharge and subsequently filed an amended complaint on March 18, 2013 (the "*Amended Complaint*") (ECF Doc. # 7).

The Plaintiff's claims have narrowed over time. The *Amended Complaint* asserted claims objecting to Arieh's discharge under 11 U.S.C. § 727(a)(2)(A) (Count I) and both Defendants' discharges under 11 U.S.C. § 727(a)(3) and (a)(4)(A) (Counts II and III, respectively). The Plaintiff thereafter withdrew Count I. (*Plaintiff's April 17, 2015 Proposed Findings of Fact*, dated Apr. 17, 2015 ("*Plaintiff's Proposed Findings*") at ¶ 7 (ECF Doc. # 37).) In addition, many of the allegations in the *Amended Complaint* referred to misrepresentations regarding the market values of Got Cholent and Spoonful. (*Amended Complaint* at ¶¶ 18, 21, 35, 37-40.) At trial, however, the Plaintiff withdrew its claim that Spoonful had any inherent market value, and thus, that Gemma had misrepresented its value as zero in Schedule B filed with this Court. (Tr. (5/8) at 68:11-20.) Furthermore, the *Plaintiff's Proposed Findings* included only one reference to the market value of Got Cholent listed in Schedule B, (*Plaintiff's Proposed Findings* at ¶ 38), and did not propose a finding that Arieh misrepresented the market value in connection with its § 727(a)(4)(A) claim. In addition, the Plaintiff did not adduce any expert testimony at trial regarding the market value of Got Cholent. Accordingly, I deem any § 727(a)(4)(A) claims based on the misrepresentation of either Spoonful's or Got Cholent's market value to have been unproven or abandoned.

The Plaintiff had also contended in connection with its § 727(a)(3) claim that the books and records maintained by the Defendants did not allow the Plaintiff to determine the market values of Got Cholent and Spoonful, (*JPTO*, Pt. IV.A. at ¶¶ 1, 3), but once again, the *Plaintiff's Proposed Findings* do not propose these findings. Furthermore, any such finding would require expert evidence regarding the proper method for determining each corporation's market value (*e.g.*, multiple of EBITDA or revenue, discounted cash flow) and the records needed to make the determination. The Court sustained the Defendants' objection to the qualifications of the

4

Plaintiff's accountant witness, Mark Perlmutter, to give a valuation opinion, (Tr. (3/5) at 15:18-16:3), and the Plaintiff did not offer any other evidence on valuation.  In addition, both corporations are essentially personal service businesses that depend on the Defendants' efforts, and it is questionable whether either corporation has a positive market value without those efforts.  Consequently, I also deem these "market value" claims to have been unproven or abandoned.

Finally, after trial, the Court asked the parties to submit proposed findings of fact and conclusions of law.  Each proposed finding had to include a reference to the record supporting the proposed finding.  It took the Plaintiff three tries, but it finally submitted acceptable proposed findings.[2]  Despite four days of questioning regarding scores of transactions, the *Plaintiff's Proposed Findings* included relatively few transactions and corresponding record references.  Because it is not the Court's role to hunt for truffles buried in the trial record, the Court will only consider the evidence cited by the parties in their submissions unless the Court is aware of other relevant trial evidence uncovered in the course of the preparation of this decision that they did not cite.[3]

---

[2]     On or about On November 10, 2015, the Plaintiff attempted to submit a fourth version of its proposed findings of fact.  This version was apparently motivated by the Court's inability to open certain QuickBooks records supplied on disk by the Plaintiff.  The Court did not ask for another version of the proposed findings and will not accept the latest one.

[3]     The Plaintiff also submitted proposed conclusions of law on or about October 17, 2014, as part of its original post-trial submission.  The Court has fully considered the Plaintiff's proposed conclusions in preparing this opinion.  Nevertheless, the proposed conclusions contained few record references and cannot supplement the deficiencies in the proposed findings.

**DISCUSSION**

The principal purpose of the Bankruptcy Code is to grant a fresh start to "the honest but unfortunate debtor." *Local Loan Co. v. Hunt*, 292 U.S. 234, 245 (1934); *accord Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007); *Grogan v. Garner,* 498 U.S. 279, 286-287 (1991). The denial of a debtor's discharge is "an extreme penalty for wrongdoing," *State Bank of India v. Chalasani (In re Chalasani),* 92 F.3d 1300, 1310 (2d Cir. 1996), and the discharge provisions "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'" *Id.* (quoting *Bank of Pa. v. Adlman (In re Adlman),* 541 F.2d 999, 1003 (2d Cir. 1996)); *accord Berger & Assocs. Attorneys, P.C. v. Kran (In re Kran)*, 760 F.3d 206, 210 (2d Cir. 2014). Nevertheless, a bankruptcy discharge is a privilege, not a right, *Christy v. Kowalski (In re Kowalski),* 316 B.R. 596, 600–01 (Bankr. E.D.N.Y. 2004); *Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 880 (Bankr. S.D.N.Y. 1994), and will be denied when the individual debtor commits an act that is plainly proscribed by 11 U.S.C. § 727(a). The plaintiff bears the burden of establishing each of the elements of an objection to discharge under § 727 by a preponderance of the evidence. *See Minsky v. Silverstein (In re Silverstein)*, 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993); *see also* FED. R. BANKR. P. 4005.

**A.    Count II – 11 U.S.C. §727(a)(3)**

Bankruptcy Code § 727(a)(3) mandates the denial of a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information ... from which the debtor's financial condition or business transactions may be ascertained, unless such act or failure to act was justified under all the circumstances of the case." 11 U.S.C. § 727(a)(3). The purpose of § 727(a)(3) is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs," *D.A.N. Joint Venture v. Cacioli (In re*

6

*Cacioli),* 463 F.3d 229, 234 (2d Cir. 2006) (quoting *In re Underhill,* 82 F.2d 258, 260 (2d Cir.

1936), *cert. denied,* 299 U.S. 546 (1936)), and ensure that "creditors are supplied with

dependable information upon which they can rely in tracing a debtor's financial history."

*Cacioli*, 463 F.3d at 234 (quoting *Meridian Bank v. Alten,* 958 F.2d 1226, 1230 (3d Cir. 1992)).

The debtor's financial information need not be perfect; it is enough "that there be available

written evidence made and preserved from which the present financial condition of the bankrupt,

and his business transactions for a reasonable period in the past may be ascertained." *Kran*, 760

F.3d at 210; *Underhill,* 82 F.2d at 260 (construing a precursor to modern 11 U.S.C. § 727(a)(3)).

Proof of a § 727(a)(3) violation involves a shifting burden.  The initial burden of going

forward with the evidence rests with the creditor to "show that the debtor failed to keep and

preserve any books or records from which the debtor's financial condition or business

transactions might be ascertained." *Cacioli*, 463 F.2d at 235.  The plaintiff is not required to

establish that the debtor intended to conceal or destroy financial information.  *State Bank of India*

*v. Sethi (In re Sethi),* 250 B.R. 831, 837 (Bankr. E.D.N.Y. 2000).  The adequacy of the debtor's

books and records depends on the number, complexity and size of the transactions in which he

has engaged.  *See Underhill*, 82 F.2d at 260; *see Office of the Comptroller General of the*

*Republic of Bolivia v. Tractman*, 107 B.R. 24, 26 (S.D.N.Y. 1989) (stating that the standard for

record keeping established in *Underhill* remains good law under the Bankruptcy Code).  "[T]he

debtor is not required to keep an impeccable system of bookkeeping or records so complete that

he can satisfy an expert in business," but is required to produce sufficient records from which the

court and the creditors can gain an accurate and complete picture of his finances.  *Sethi,* 250 B.R.

at 838.  Further, although § 727(a)(3) focuses on records relating to the debtor's personal

financial affairs, his failure to keep adequate financial records regarding the business transactions

7

of a closely held corporation that are necessary to determine his personal financial affairs may result in the denial of a discharge.  *See CM Temp. Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 419 (Bankr. S.D. Ohio 2007); *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 307-08 (Bankr. E.D. Pa. 2006); *Sterling Int'l, Inc. v. Thomas (In re Thomas)*, No. 01-21302, 2003 WL 21981707, at *10-11 (Bankr. D. Idaho July 17, 2003); *Blanchard v. Ross (In re Ross)*, No. 97–19956 DWS, 1999 WL 10019, at *4 (Bankr. E.D. Pa. Jan. 4, 1999).

Once the plaintiff has shown the absence or the inadequacy of the debtor's records, the burden of going forward shifts to the debtor to justify his failure to preserve or keep them. *Cacioli,* 463 F.3d at 235.  The sufficiency of the debtor's justification is "a question in each instance of reasonableness in the particular circumstances."  *Cacioli*, 463 F.3d at 235 (quoting *Underhill,* 82 F.2d at 259–60; *accord Meridian Bank,* 958 F.2d at 1231 (stating that "[t]he issue of justification depends largely on what a normal, reasonable person would do under similar circumstances").  The court may consider a variety of factors including "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice."  *Cacioli*, 463 F.3d at 237 (quoting *Meridian Bank*, 958 F.2d at 1231);[4] *accord Sethi*, 250 B.R. at 839.

 Count II asserted that the Defendants had "concealed, falsified and/or failed to keep or preserve certain information, including books, documents, records, and papers, from which the financial condition or business transactions of that business might be ascertained," and without

---

[4]    Some courts have incorrectly applied the same standards to determine the *adequacy* of the debtor's books and records; these factors are applied in deciding whether the debtor has justified his failure to keep books and records and not their adequacy.  *Cacioli*, 463 F.2d at 236.

this information, the financial condition of the Defendants cannot be determined, as each is the

sole beneficiary of any profits from their respective corporations.  (*Amended Complaint* at ¶¶ 51-

52.)

### 1.  Arieh – Got Cholent

In the case of Got Cholent, the *Amended Complaint* alleged that the "missing

documentation" included sales invoices/contracts, sales tax returns, accounts payable details,

accounts receivable details, cash receipts and check disbursements and bank statements.

(*Amended Complaint* at ¶ 30.)  The *Joint Pretrial Order* amplified this charge,[5] stating that as a

result of the missing records, the plaintiff could not ascertain the truth of Arieh's claim that Got

Cholent was worth zero[6] or the amount of Arieh's income from Got Cholent during the years of

2009, 2010, 2011 and 2012.  (*JPTO*, Pt. IV.A. at second ¶ 1.)[7]

All of Got Cholent's financial records are maintained in a QuickBooks file.  These

records consist of the General Ledger and all related reports,  including the Profit and Loss

Statements for 2009 through 2013, the Balance Sheets for 2009 through 2013, the Invoice

Reports and Deposit Reports.  (*JPTO*, Pt. VI. at ¶¶ 16-17.)  Got Cholent has also maintained a

---

[5]     The parties agreed in the *Joint Pretrial Order* that the pleadings were deemed amended to embrace the contentions listed in Part IV.  (*JPTO*, Pt. IV at p. 8 ("The pleadings are deemed amended to embrace the following and only the following  contentions of the parties. . . .").)

[6]     As noted earlier, the Plaintiff either abandoned this claim or failed to prove it.

[7]     The Plaintiff devoted a significant portion of the trial to Arieh's failure, and to a lesser extent Gemma's failure, to produce records during the pre-bankruptcy judgment enforcement phase and the Plaintiff's post-bankruptcy, pre-litigation investigation or its post-litigation discovery.  Although the failure to produce documents during discovery supports the inference that a debtor has failed to maintain appropriate records, the inference may be rebutted by the production of the missing documents.  *See Schackner v. Breslin Realty Dev. Corp.*, No. 11-CV-2734 (JS), 2012 WL 32624, at *5 (E.D.N.Y. Jan. 5, 2012).  Thus, while the Court does not condone the failure to comply with pre-petition discovery requests and may infer from the failure to produce records that they do not exist, the ultimate inquiry under § 727(a)(3) is whether the Defendants kept and maintained the records and not whether they produced them.

bank account with JP Morgan Chase ("Chase"),[8] (*see* DX Q), a credit card account with

American Express ("Amex") and a PayPal account since prior to the Petition Date.  Gemma's

name also appears on the Amex account.  (*See* DX P.)  In addition to the QuickBooks files,

Arieh produced Got Cholent's bank statements, (*see* DX Q, R),  and Amex receipts, (*see* PX 58),

Got Cholent's corporate income tax returns  for 2009 through 2012, (*see* DX N), records relating

to its PayPal account, (*see* PX 24, 25; DX S), and certain contracts.  (*See* PX 13.)

Arieh maintains the QuickBooks records, (*JPTO* ¶ 6), the main source of information

about Got Cholent's financial affairs.  Arieh was not well-versed with QuickBooks at the

beginning.  He was not taught QuickBooks or any similar software program in college, and

described himself as "self-taught" through trial and error.  (Tr. (3/20) at 61:21-62:3.)  Jason Leff,

Got Cholent's accountant, testified that Arieh did not have a good handle on accounting, (Tr.

(9/15) at 16:3-4), and instructed Arieh in 2009 or the beginning of 2010 on how to use

QuickBooks.  (Tr. (9/15) at 22:18-23.)  Arieh needed multiple lessons, and eventually hired a

bookkeeper to straighten out the record keeping.  (Tr. (9/15) at 17:4-8.)  Leff also told Arieh not

to pay for personal expenses through the business.  (Tr. (9/15) at 18:3-6.)

The Got Cholent records, though not perfect, enable a creditor to ascertain Got Cholent's

financial condition at present and for a reasonable period in the past.  According to the corporate

tax returns,[9] Got Cholent realized ordinary business income of $1,537 in 2009 and $25,643 in

2010, and earned taxable income of $1,113 in 2011 and a loss of $3,581 in 2012.  (DX N.)  The

---

[8]    Prior to opening the Chase account, Got Cholent conducted its banking at the  Ridgewood Savings Bank
("Ridgewood").  The Ridgewood account was closed on October 24,  2011. (PX Excerpt 22.3.)

[9]    Got Cholent filed tax returns as a subchapter "S" corporation for the years 2009 and 2010, but never elected
subchapter "S" status.  (*Declaration in Lieu of Direct Testimony of Jason Leff*, dated Feb. 28, 2014 ("*Leff
Declaration*"), at ¶ 12.)  Starting with 2011, Got Cholent has filed tax returns as a subchapter "C" corporation.

QuickBooks entries and Amex and bank statements provide more detail regarding Got Cholent's income and expenses.  Together, the books and records depict a corporation that is marginally profitable and wholly dependent on Arieh's efforts.

The Plaintiff contends, however, that the Got Cholent records do not accurately reflect or do not reflect at all certain transactions in which Got Cholent engaged.  In particular, the Plaintiff insists that the Got Cholent records fail to adequately account for its use of cash or distinguish between the use of Got Cholent's assets for business purposes or for the personal benefit of the Defendants.  These contentions fall into four categories: (1) Got Cholent did not retain receipts evidencing the use of petty cash; (2) Got Cholent deposited cash in its bank account that was not reflected in the QuickBooks file; (3) the Defendants' used Got Cholent's cash or assets for their personal benefit; and (4) Got Cholent failed to account adequately for use of its cash.

### a.   Receipts for Petty Cash

Prior to the trial, the Defendants produced several boxes of documents to the Plaintiff's accountant, Leon Perlmutter.  (Tr. (3/5) at 32:4-9.)  The production included receipts, but Perlmutter admitted at trial that he did not review them and did not know what they were.  (Tr. (3/5) at 138:9-24.)  In addition, Arieh produced Amex receipts at trial organized by year in response to a subpoena for those receipts.  (Tr. (03/20) at 22:11-23:7; Tr. (9/15) at 55:11-56:12; *see* PX 58.)  Thus, the Plaintiff failed to demonstrate that Got Cholent did not keep or preserve records concerning how it used its petty cash, or that a creditor could not determine whether it was used for business or personal reasons.

### b.   Cash Deposits

The Plaintiff identified twelve transactions in 2010 where Got Cholent supposedly deposited customer checks aggregating $43,416.84 in its Ridgewood bank account but did not reflect these deposits in QuickBooks.  (*Compare* PX Excerpt 22.2 *with* PX Excerpt 17.)  Arieh testified that Got Cholent recorded its Ridgewood deposits in QuickBooks in "bulk" on the 28th of each month, and a single entry could encompass as many as thirty checks.  (Tr. (3/20) at 90:1-5.)  The cash receipts and disbursement records, (PX 17), support Arieh's testimony.  The monthly deposits made on January 28th through November 28th were substantially larger than the corresponding checks identified in PX 22.2.

In December, QuickBooks began recording deposits on multiple days during the month and not just on the 28th.  The Plaintiff identified a single $5,000 check from Burton and Gail Cohen to Got Cholent, which it deposited into its Ridgewood account on December 8, 2010, (*see* PX Excerpt 22.2 at 10), but allegedly failed to record in QuickBooks.  But contrary to the Plaintiff's assertion, QuickBooks includes a corresponding $5,000 deposit into the Ridgewood account on that day.  (PX 17 at 19.)  Accordingly, the Plaintiff has failed to prove that Got Cholent did not record bank deposits in QuickBooks.

### c.   The Use of Got Cholent Assets for the Defendants' Personal Benefit

The evidence showed that the Defendants used Got Cholent's assets on several occasions for their personal benefit.  Got Cholent bought large amounts of food for its catering business. Arieh took home some of the purchased food for his family's use, but the QuickBooks file does not reflect what portion of Got Cholent's food expenditures were taken by Arieh.  (Tr. (3/20) at 57:20-58:18, 59:19-21; Tr. (9/15) at 32:20-33:12.)  In addition, Arieh purchased a 2002 van in

12

2011 with Got Cholent funds, (Tr. (3/20) at 30:8-22),[10] that he uses for personal as well as

business purposes, (Tr. (3/20) at 38:16-20), and Got Cholent pays for the gasoline and the

maintenance.  (*See* Tr. (3/20) at 29:25-30:4, 32:2-9, 37:22-38:8.)  The Plaintiff argues that Got

Cholent's records relating to expenses for food and the van failed to distinguish between Got

Cholent's business expenses and Arieh's personal expenses.

In addition, Gemma or Arieh used Got Cholent's Amex credit card[11] to make purchases

for their personal benefit.  On five occasions in 2011, she purchased groceries for their home

from Peapod.[12]  These purchases aggregated $436.26.  (*See* PX Excerpt 54.)  Arieh (or Gemma)

used the Amex card on four occasions in 2011 to make purchases aggregating $939.16 for

footwear ($102.36), (DX P-2 at p. 3 of 40), a restaurant bill ($60.50), (DX P-3 at p. 2 of 26),

"Phish" tickets ($535.60), (DX P-4 at p. 34 of 44), and theater tickets ($240.70).  (DX P-2 at p. 2

of 40.)  Finally, on November 21, 2011, Arieh used Got Cholent's PayPal account to pay

"Jewelry by Johann" $72.00 to replace his wedding ring.  (*See* PX Excerpt 16.13; Tr. (3/20) at

101:6-8.)

The Defendants' personal use of Got Cholent's assets should probably have been

reflected in Got Cholent's books and records as compensation to Arieh.[13]  But the use was

---

[10]    The ownership of the van is unclear.  Arieh listed the van as his personal asset in his bankruptcy schedules and Got Cholent listed the van as its asset in its 2011 and 2012 balance sheets.  (*JPTO* ¶ 47.)

[11]    Gemma had her own Got Cholent Amex card, and both her name and Got Cholent's appeared on the Amex account statements.  (DX P.)  Gemma testified that Arieh also had a card and that she was a guarantor on the account.  (Tr. (3/5) at 157:19-158:8).

[12]    Peapod is a home delivery food service.  The evidence showed that the deliveries were made to the Defendants' home address.  (PX Excerpt 54.)

[13]    Although not germane to the § 727(a)(3) claim, Arieh estimated the value of these benefits at $450 per month in Schedule I.  (*See* PX Excerpt 3.3.)

infrequent and the amounts minimal based on the evidence cited in the *Plaintiff's Proposed Findings*.  The Defendants received a personal benefit of $1,500 from the use of the Amex card and PayPal account.  In addition, the Defendants and their children benefitted from the food that Arieh brought home and, to some extent, gasoline and maintenance that Got Cholent paid for in connection with a van that was admittedly used in the catering business.  These personal benefits did not affect Got Cholent's gross revenue and, if booked as income to Arieh, would have reduced Got Cholent's net income and increase Arieh's income in the same amount.  The Plaintiff is not claiming, in this regard, that Arieh concealed income by using Got Cholent's assets for his family's benefit, and has not explained how the failure to account for the personal use of Got Cholent's Amex and PayPal accounts was material to a determination of his income.  Under the circumstances – particularly the infrequency, the minimal amounts involved, and the absence of any net effect on Arieh's income – I find that the personal use of Got Cholent's assets was immaterial to a determination of Arieh's financial condition.

### d.    Accounting for the Use of Cash

On seven occasions identified by the Plaintiff between December 13, 2011 and May 14, 2012, Arieh purchased items from a supermarket using the Got Cholent Chase Account debit card, and received cash back.  (PX Excerpt 21.)  For example, he might buy $20.00 worth of food, ask the cashier to charge his debit card $50.00 and receive back $30.00 in cash.  To this extent, the supermarket essentially functioned as an ATM.  According to the Plaintiff, the general ledger reflected the food purchase but not the cash received over and above the food purchase, and there is no documentation regarding how the cash was spent.  The total amount of cash received on these seven transactions was $260.00.  (*See* PX Excerpt 21.)  Similarly, Got

14

Cholent received checks from third parties in 2010 but deposited only a portion of each check and received the balance, aggregating $2,330.00, back in cash. (PX 22.)

Got Cholent's accounting for these transactions was less than ideal; its records do not reflect corresponding increases to petty cash or any other use or disposition of the cash received back. Nevertheless, the supermarket transactions amounted to only $260.00 during the period shortly before or right after the bankruptcy filing. The bank transactions, while larger, were more remote in time, and the Plaintiff did not identify any similar occurrences in 2011, 2012, or during the two year period between the Petition Date and the trial. Given the *de minimis* amounts involved during the period around the time of the Petition Date and the remoteness of the larger withdrawals, I conclude, on balance, that the inability to account for the use of this cash did not prevent the ascertainment of Got Cholent's financial condition at the time of or during the bankruptcy or for a reasonable time before the Petition Date.

### e.    Other Alleged Shortcomings

The Plaintiff pointed to a few other alleged shortcomings in Got Cholent's records that were either unsupported by the evidence or amounted to nit-picking. The Plaintiff claimed that 130 transactions were deleted in the QuickBooks file on July 6, 2011, (*see* PX 55), but Arieh did not recall deleting 130 transactions on that day. (Tr. (5/8) at 21:13-15.) Plaintiff's counsel showed Arieh a report entitled "Voided/Deleted Transactions Summary," (PX 55), which was apparently prepared by Plaintiff's counsel using QuickBooks. Arieh had never seen it, and he could not answer any questions regarding its contents or what the report was supposed to depict. (Tr. (5/8) at 21:23-22:19.) I also don't know what these entries mean.

15

Counsel also showed Arieh a report entitled "Invoices from All Dates," (PX Excerpt 16.4), in which counsel blacked out thirty-eight entries, (*see id.* at 1 ("Bold added by plaintiff's counsel"), rendering them unreadable.  The blacked-out entries apparently related to instances in which the corresponding invoice was deleted from QuickBooks.  Arieh speculated that the invoices were entered into the QuickBooks file, but the transaction was never consummated.  (Tr. (3/20) at 79:24-80:24.).  Moreover, although the invoices were missing from QuickBooks, a separate report entitled "Voided/Deleted Transactions Detail," (PX Excerpt 16.5), itemized many of the invoices that were identified as deleted in PX Excerpt 16.4 during the same time period.  The Plaintiff also pointed to four instances in which the order was cancelled but the invoice was retained.  (*See* PX Excerpt 16.6.)  In other words, Got Cholent deviated from its general practice of deleting the invoices on four occasions spanning nearly three years.

The Plaintiff charged and Arieh admitted that Got Cholent did not maintain a separate logbook for parties.  He testified that he keeps track of the parties by putting the invoices, which list the date of the party (the "due" date), (*see* PX Excerpt 16.10), on the kitchen wall.  (Tr. (3/20) at 69:17-70:9.)  The Plaintiff did not offer evidence that a customer logbook was a record that is ordinarily maintained or must be maintained in order to ascertain Got Cholent's financial condition.  Nor did the Plaintiff offer evidence that Got Cholent ever suffered from Arieh's system of keeping track of the parties.

The Plaintiff contended that Arieh failed to produce all of Got Cholent's customer contracts, (*Plaintiff's Proposed Findings* at ¶¶ 88-90), although he admittedly produced many customer contracts.  (*See* PX 13, Part II.)  Arieh testified that Got Cholent does not enter into a written contract with every customer.  It will generally enter into a written contract with a customer if the customer is not well known and/or asks Got Cholent to hold the date in the

16

future.  In other instances, Got Cholent simply sends an invoice to the customer.  (Tr. (3/20) at

74:9-75:7.)  The Plaintiff identified a total of six invoices that referred to contracts that had not

been produced.  (PX Excerpt 16.11.)

The Plaintiff also identified two instances in which the QuickBooks files did not reflect

invoices or contracts that corresponded to the customer payments tendered by John Gallucci for

"Arielle's Bar Mitzvah," (PX Excerpt 22.2 at 2-3), and by Kenneth Rochlin for "Zachary's Bar

Mitzvah." (PX Excerpt 22.2 at 6-7.)  In other words, the Plaintiff could not connect two

customers with their corresponding invoices or contracts.

In summary, Got Cholent's recordkeeping was not impeccable, but it was reasonable

under the circumstances and enabled a creditor to ascertain Got Cholent's financial condition,

which, in turn, allowed creditors to ascertain Arieh's financial condition during the pendency of

the bankruptcy proceedings and for a reasonable period before the Petition Date.  In particular,

the Got Cholent books and records were sufficient to inform a creditor of the likelihood that Got

Cholent will produce value to Arieh, and in turn to Arieh's creditor, either because it has or will

generate income that can be paid as a dividend to Arieh or because Got Cholent has value that

could inure to the benefit of Arieh's creditors.  Furthermore, although Got Cholent's accounting

for the use of its cash was not perfect, it was reasonable in light of Arieh's relative lack of

business sophistication and the number, size and relative lack of complexity of Got Cholent's

business.

### 2.     Arieh – Personal Records

Arieh did not have a personal bank account or credit cards in his own name, and aside

from the Defendants' personal income tax returns, did not have any personal financial records.

17

Instead, the evidence showed that Gemma maintained the family's finances and wrote checks from her own accounts to cover their expenses. While the absence of a personal bank account or other personal assets might imply that Arieh was shielding his assets from his creditors, the Plaintiff abandoned any claim that Arieh was concealing or secreting assets, such as by using Got Cholent's assets personally rather than paying himself a salary. Since the Court has found that the Got Cholent books and records were sufficient and Arieh did not maintain a personal bank account or other assets in his name, the Plaintiff has failed to prove that Arieh failed to keep or preserve information from which his financial condition or business transactions can be ascertained, and he is entitled to judgment dismissing Count II.

### 3. Gemma

The principal § 727(a)(3) objection against Gemma pertains to Spoonful's record keeping. The *Amended Complaint* alleged that the missing Spoonful documents included bank statements for three different accounts, a general ledger and revenue and expense accounts. (*Amended Complaint* at ¶ 31.) The *JPTO* added the contentions that Gemma failed to maintain proper records regarding her earnings for 2010 and 2011 and purposely refused to produce certain records regarding those earnings. The Plaintiff also contended that it is impossible to determine, as represented in Schedule B, that the value of Spoonful was zero, (*JPTO*, Pt. IV.A. at ¶ 3). As discussed earlier, the Plaintiff has either abandoned or failed to prove this claim.

Spoonful is a simple business; Gemma is its only employee, and she provides speech therapy services to children. Spoonful's sole income is derived from the fees patients pay for her services. She maintains a logbook in which she lists her patient's hourly appointments. (Tr.

(3/20) at 9:13-17; *see* DX M.)[14]  Gemma computes Spoonful's annual income by multiplying the number of appointments reflected in the logbook in a given year by $150, which is the amount Spoonful charges per session.  (Tr. (3/20) at 12:7-21.)  After determining its gross income, Spoonful deducts its yearly expenses, including Gemma's salary.  Gemma itemizes Spoonful's income and expenses in spreadsheets, (DX J), which she provides to Spoonful's accountant.

Spoonful filed federal income tax returns as a subchapter "S" corporation each year.  The returns reflected Gemma's compensation and Spoonful's ordinary income, which passed through to Gemma.  (*See* DX K.)  In 2011, Spoonful earned an additional $8,000 in cash in connection with a research project, which was not recorded in the patient logbook or deposited in any bank account.  (DX H at 16:25-17:8.)  Spoonful amended its 2011 tax return to reflect the additional $8,000 in income.  (Tr. (5/8) at 74:1-10.)

Spoonful maintained a savings account at HSBC until it was closed in October 2010, and a checking account at HSBC, which was open as of the Petition Date.  (*See* PX Excerpt 35.)  The Plaintiff had demanded the production of HSBC bank statements, cancelled checks, deposit slips and documents evidencing the withdrawal of monies from this account from 2009 to the date of the demand, September 30, 2013.  Gemma only produced bank statements through February 2012 and stated that, to the best of her knowledge, there were no other responsive documents in her possession or control.  (PX 7 at 6-7.)  She did not produce any cancelled checks.

Although the type of records maintained by Spoonful would be adequate given the nature and volume of the transactions, the evidence showed that they were not properly maintained.

---

[14]     The names of the patients in DX M were redacted.

Specifically, there was a significant discrepancy between the amounts Gemma said she earned and amounts she deposited into her personal bank accounts.  In 2010 and 2011, Gemma had only two sources of funds – the amounts she earned through Spoonful and the $275 she received each month from her mother-in-law.  (Tr. (3/20) at 8:22-9:10.)  She deposited the patient payments and her mother-in-law's checks into Spoonful's HSBC account, (DX H at 27:9-16), or her personal account.  (Tr. (3/20) at 15:7-19.)

Her aggregate deposits greatly exceeded her aggregate receipts.  In 2010, Spoonful reported gross receipts of $57,750 under the accrual method.  Adding in her mother-in-law's monthly contribution of $275.00, Spoonful and Gemma received $61,050.  The same year, Gemma deposited $42,763.00 into Spoonful's HSBC checking and savings accounts, (PX Excerpt 35.2), and $30,813.00 into her Schwab brokerage account –exclusive of a Government check in December in the sum of $222.00, (*see* PX Excerpt 38.3) – for total deposits of $73,576.00.

The same was true in 2011.  Spoonful reported gross receipts of $55,550 under the accrual method, and Gemma would have received an additional $3,300 from her mother-in-law.  She deposited $59,520.01 into Spoonful's HSBC checking account, (*JPTO* ¶ 41), deposited $13,621.38 into her Schwab brokerage account, (DX G), and earned an additional $8,000 in cash that she did not deposit into any account, for a grand total of $81,141.39.

Thus, in these two years, the combination of Spoonful's reported gross receipts and the $275.00 monthly contributions totaled $119,900.00, while the deposits and undeposited cash totaled $154,717.39.  While the difference, $34,817.39, might result from discrepancies between the accrual method of reporting and the actual receipt of cash, those differences should even out

20

over time, particularly since Spoonful's gross receipts remained relatively unchanged in 2009,

2010 and 2011.  In other words, Spoonful may have received additional cash in 2010 from

income reported in 2009 but also might have accrued income in 2010 that it did not receive until

2011.  Similarly, Spoonful may have accrued income in 2011 that was not received until 2012.

There were no records, such as a cash receipts journal, that might explain when money was

actually received by Spoonful, at least in 2010 and 2011, other than the bank statements.  In

addition, Gemma testified that Spoonful did not maintain an accounts receivable ledger, (Tr.

(9/15) at 11:2-19), even though she sometimes waited for her patients to receive their insurance

reimbursement before they paid her.  (DX H at 34:19-35:11.)

The difference might also be explained by the receipt of money by Spoonful and the

payment of Gemma's salary, by check or cash, drawn from the Spoonful account and deposited

by Gemma into her Schwab account.  If that had occurred, certain dollars would be counted

twice, once when received by Spoonful and a second time when paid to and received by Gemma.

However, there was no evidence that this ever actually happened.  The Spoonful bank statements

did not identify the payees of the checks that they listed, Gemma failed to produce any cancelled

checks from the Spoonful HSBC account that might show payments made to her that could be

matched to deposits into her Schwab account.

The information provided by Gemma does not permit her creditors to ascertain the reason

for a difference of more than $34,000 between the sources of her income and the amounts she

deposited during 2010 and 2011.  She was getting this cash from somewhere, and in the absence

of evidence of other sources of income, I infer that she was not accurately recording Spoonful's

patient sessions.  This inference is bolstered by the fact that she failed to record the sessions

relating to the $8,000 cash payment in the Spoonful logbook, or for that matter, deposit it into a

bank account.  I do not attribute the absence of the information to any wrongful intent on

Gemma's part, but wrongful intent is irrelevant to a § 727(a)(3) claim.  The discrepancy between

the recorded income and the recorded deposits was material.

In addition, she did not retain all of her bank statements and cancelled checks, including

for periods after the Defendants filed their bankruptcy petition and even after the Plaintiff

commenced this adversary proceeding charging them with inadequate record keeping.  The

debtor has a duty to take reasonable steps to retain records from which the debtor's financial

condition may be ascertained, *see Aid Auto Stores, Inc. v. Pimpinella* (*In re Pimpinella*), 133

B.R. 694, 698 (Bankr. E.D.N.Y. 1991) (internal quotations omitted); *JP Morgan Chase Bank v.*

*Hobbs* (*In re Hobbs*), 333 B.R. 751, 758 (Bankr. N.D. Tex. 2005) (the debtor has duty to make

efforts to retain and produce records), including bank statements and cancelled checks.  *Lassman*

*v. Hegarty* (*In re Hegarty*), 400 B.R. 332, 342 (Bankr. D. Mass. 2008) (debtor "routinely

discarded" personal bank statements and cancelled checks prior to bankruptcy case, without

which his financial condition could not be ascertained); *see also Desiderio v. Devani* (*In re*

*Devani*), 535 B.R. 26, 33 (Bankr. E.D.N.Y. 2015) (debtor produced only one unsigned tax return

and failed to produce cancelled checks and personal bank statements for the three years

preceding the bankruptcy).  Here, Gemma failed to retain and produce bank statements after

February 2012, which would have provided information as to her income immediately before the

filing of the petition and her post-petition income.  Gemma also failed to retain and produce any

cancelled checks, which, as noted above, might have helped eliminate instances of double-

counting.  Accordingly, the Plaintiff has demonstrated that Gemma did not maintain adequate

records that permitted her creditors to ascertain her income for the period immediately preceding

the bankruptcy and during the bankruptcy.

As a result, the burden shifted to her to justify her failure to maintain the necessary information.  It is certainly true that Spoonful is not a complex business, and creditors would not expect the type of record keeping normally found in other businesses, even one like Got Cholent.  Nevertheless, although Gemma was relatively unsophisticated from a business standpoint, she understood the importance of keeping accurate records for her business and created detailed spreadsheets to allow Leff to prepare Spoonful's tax returns.  She also kept track of and paid the family expenses.  Finally, she should have understood the need to maintain business and personal financial information, such as bank statements and cancelled checks, given the Plaintiff's efforts post-judgment to acquire the information, the filing of the bankruptcy and the commencement of this adversary proceeding.  Accordingly, the Plaintiff demonstrated that Gemma failed to keep and preserve records from which her financial condition could be ascertained, and her discharge is denied under 11 U.S.C. § 727(a)(3).

## B.    Count III – 11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) denies a discharge to the debtor who knowingly makes a material, false statement with fraudulent intent.  *Dubrowsky v. Perlbinder* (*In re Dubrowsky*), 244 B.R. 560, 572 (E.D.N.Y. 2000); *Nof v. Gannon* (*In re Gannon*), 173 B.R. 313, 319 (Bankr. S.D.N.Y. 1994); *Zitwer v. Kelly* (*In re Kelly*), 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992).  The plaintiff must establish by a preponderance of the evidence that the debtor (1) made a statement under oath, (2) the statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case.  *Vidomlanski v. Gabor* (*In re Gabor*), Adv. Proc. No. 06-1916, 2009 WL 3233907, at *7 (Bankr. S.D.N.Y. Oct. 8, 2009); *Bank of India v. Sapru* (*In re Sapru*), 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991).  The bankruptcy petition and schedules of a debtor are

23

considered statements under oath, *Gabor*, 2009 WL 3233907, at \*7; *Gannon*, 173 B.R. at 320,

and both omissions and affirmative misstatements can constitute false statements under §

727(a)(4)(A). *Gabor*, 2009 WL 3233907, at \*7; *Forrest v. Bressler* (*In re Bressler*), 387 B.R.

446, 460 (Bankr. S.D.N.Y. 2008).

A statement is material if it bears on the discovery of estate property or the debtor's

business dealings. *Gannon*, 173 B.R. at 319–20. Moreover, "otherwise immaterial falsehoods or

omissions can aggregate into a critical mass substantial enough to bar a debtor's discharge."

*Bressler*, 387 B.R. at 462; *accord Gabor*, 2009 WL 3233907, at \*9; *Sapru*, 127 B.R. at 315–16

(Bankr. E.D.N.Y. 1991) ("[E]ven if each falsehood or omission considered separately may be too

immaterial to warrant a denial of discharge pursuant to § 727(a)(4)(A) certainly the multitude of

discrepancies, falsehoods and omissions taken collectively are of sufficient materiality to bar the

Debtor's discharge.").

In determining fraudulent intent, the court can consider, among other factors, the debtor's

level of financial sophistication. *Rossi v. Moreo* (*In re Moreo*), Adv. Proc. No. 07-8256-478,

2009 WL 2929949, at \*8 (Bankr. E.D.N.Y. Sept. 10, 2009). Furthermore, reckless indifference

to or disregard of the truth is the equivalent of fraud for the purposes of § 727. *In re Chavin*, 150

F.3d 726, 728 (7th Cir. 1998) (Posner, J.); *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1583

n.4 (2d Cir. 1983); *see also Diorio v. Kreisler-Borg Constr. Co.*, 407 F.2d 1330, 1331 (2d Cir.

1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of

statements made by the bankrupt . . . . [R]eckless indifference to the truth . . . is the equivalent of

fraud."). "[T]he cumulative effect of all the falsehoods together evidences a pattern of reckless

and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent

required by § 727(a)(4)(A)." *Kaiser*, 722 F.2d at 1583 n.4 (quoting *Guardian Indus. Prods., Inc.*

24

*v. Diodati* (*In re Diodati*), 9 B.R. 804, 808 (Bankr. D. Mass. 1981); *accord Gabor*, 2009 WL 3233907, at *9 ("[N]umerous omissions that display a pattern of misleading conduct are sufficient to establish a fraudulent false oath.") (quoting *In re Bressler*, 387 B.R. at 462).

The misstatements identified by the Plaintiff appear primarily in the Defendants' Schedules and Statement of Financial Affairs ("SOFA"). Schedule I differentiates between the income listed by Arieh and Gemma, and hence, it is possible to attribute the alleged misstatements regarding their income to one or the other. The remaining schedules and the SOFA do not differentiate between joint debtors, although in some instances the Plaintiff has attributed the misstatement to one or the other. The following discussion will first deal with the misstatements attributable to the specific debtor and then deal with the misstatements attributable to both.

### 1.    Alleged Misstatements by Arieh

The principal complaint directed against Arieh is that he falsely stated that his income was zero in 2010, 2011 and 2012. In response to SOFA Question # 1, Arieh stated that his income for 2010, 2011 and the period of 2012 preceding the Filing Date was zero. (PX 3 at p. 33 of 49.) In his original schedules, he listed "projected" net monthly income of $1,000 and an additional $450 representing "Expense reimbursement from Got Cholent," (PX 3 at p. 28 of 49), but subsequently amended Schedule I to eliminate the $1,000 in net income. (DX Excerpt D.2 (a).) Finally, in the *Chapter 7 Statement of Current Monthly Income and Means-Test Calculation* he signed on May 2, 2012, Arieh stated that his monthly gross wages, salary, tips, bonuses, overtime, commissions for the six months preceding the Petition Date was zero, (PX 3.2 at line 3), but he received "Reimbursement of Expenses from Got Cholent" in the monthly amount of $450. (*Id.* at line 10(b).)

25

The Plaintiff argues that his income was not zero because Got Cholent paid for his food and van and he used the Got Cholent Amex card and PayPal account for his personal benefit.  As noted in connection with the Plaintiff's § 727(a)(3) claim, the Plaintiff failed to show that the benefits derived by Arieh or his family from the personal use of Got Cholent's Amex card and PayPal account had a material effect on Arieh's income.  The Plaintiff has also not proved that in failing to report these benefits as income Arieh intended to deceive his or the Defendants' creditors.

In addition, Arieh listed a monthly $450 "expense reimbursement" in Schedule I to account for the food and the van.  Although I question the characterization of the $450 as an expense reimbursement rather than income, I find that it reflected Arieh's good faith estimate of the value he received from Got Cholent each month for the food and gas and was not made with any intent to defraud his creditors regarding the value of these benefits.[15]

The Plaintiff also contends that Arieh failed to list a $1,600 charitable contribution made during the year preceding bankruptcy in response to SOFA Question # 7.  (*Plaintiff's Proposed Findings* at ¶ 130.)  On September 15, 2011, Got Cholent donated $1,000 in food, and the QuickBooks files contain the notation "Donation by Ari White and Gemstone Catering."  (PX Excerpt 16.14 at 1.)  On October 26, 2011, Got Cholent donated $600 in extra food to their landlord's kiddish in honor of the Defendants' ninth wedding anniversary and the first birthday of their son.  (PX Excerpt 16.14 at 3; Tr. (5/8) at 23:15-24:9.)  The question is whether a debtor

---

[15]    The Plaintiff complains that Got Cholent's records do not differentiate between food purchases or van use for business and family purposes.  The Plaintiff does not explain how Got Cholent or Arieh was supposed to allocate the food he took home, especially when part of that food consisted of leftovers.  Similarly, Got Cholent used the van for business purposes, and the Plaintiff does not suggest an appropriate method for allocating the van-related expenses.  Under the circumstances, the approximation of $450 per month reflects a good faith estimate.

must disclose a gift or charitable contribution made with non-debtor property by a corporation he wholly owns.

SOFA Question # 7 is concerned with gifts or charitable contributions made with debtor property. The Plaintiff implies that Got Cholent's property should be deemed property of Arieh, (*Plaintiff's Proposed Findings* at ¶ 130 (criticizing the $1,000 contribution because "Got Cholent was not profitable at the time of the donation and that he made this donation at a time that he was delinquent in responding to the Plaintiff/Judgment Credit's [*sic*] subpoena to obtain financial information from him in order to collect on the Judgment.")), but has never argued or proved that the Court should pierce the corporate veil of Got Cholent and treat its assets (as well as its liabilities) as those of Arieh. Absent piercing, the Plaintiff could not enforce its judgment against Got Cholent's assets, and if Got Cholent fraudulently transferred property worth $1,600 while insolvent or a judgment debtor, that is a cause for concern to Got Cholent's creditors but does not implicate the rights of Arieh's personal creditors. In short, the Defendants were not required to list Got Cholent's charitable contributions in their SOFA responses.

Finally, the Plaintiff maintains that Arieh failed to schedule his personal liability for Got Cholent's unpaid sales taxes. Got Cholent had failed to file sales tax returns or pay sales taxes for a number of quarters in 2010 and 2011, (*Leff Declaration* at ¶ 14), and as of the Petition Date, listed a current "sales tax payable" in the amount of $28,514.45. (PX Excerpt 16.2 at 2.) On or about March 31, 2014, the New York State Department of Taxation and Finance issued a Certification of Tax Warrant indicating that a warrant had been docketed against Got Cholent on March 4, 2014 in the amount of $33,213.87. (PX 57.)

Arieh did not list Got Cholent's unpaid sales taxes as a personal liability even though New York law would likely impose "responsible officer liability" on him for unpaid sales taxes. *See* N.Y. TAX LAW § 1133(a) (McKinney 2015).  During the Defendants' § 341 meeting, their chapter 7 trustee raised this omission with Arieh's attorney.  The latter questioned the need to schedule the liability because the taxes were owed by Got Cholent.  The trustee opined that they were fiduciary taxes that Arieh would have to pay personally.  Arieh's attorney was not sure, and the trustee advised him to check it out.  (PX 44.1 at 11:5-17; *see also* PX 44.2 at 26:10-12.)

There was no evidence that New York ever assessed the unpaid tax liability against Arieh personally, and Arieh's attorney seemed to be of the mind that he did not have to list Got Cholent's sales tax liability as Arieh's debt.  Although the chapter 7 trustee was undoubtedly correct on the law, Arieh's attorney raised a good faith dispute regarding the need for disclosure, and I do not find the failure to disclose this tax liability was the product of an intent to deceive Arieh's creditors.

### 2.    Alleged Misstatements by Gemma

The Plaintiff points to five alleged misstatements attributable solely to Gemma.  First, she knowingly made a false statement under oath in response to SOFA Question # 1 when she understated her gross income from her business in 2011.  (*JPTO*, Pt. IV.A. at ¶ 7.)  Second, she misrepresented her income in Schedule I.  Third, she failed to list a gift she made to a custodial account she maintained for her son in response to SOFA Question # 7.  Fourth, she failed to list in Schedule B that the Spoonful HSBC account had $3,147.85 on deposit on the Petition Date. (*Plaintiff's Proposed Findings* at ¶ 100.)  Fifth, she failed to disclose in response to SOFA Question # 3 that she had made payments in excess of $10,000.00 to Amex for amounts that she

28

owed on that card less than ninety days before the bankruptcy was filed.  (*Plaintiff's Proposed Findings* at ¶ 121.)

Gemma objected to the *Plaintiff's Proposed Findings*.  She argued that they went well beyond the § 727(a)(4)(A) claim alleged in Count III of the *Amended Complaint*.  (*Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law*, dated Nov. 14, 2014, at ¶ 99 (ECF Doc. # 36).)  The *Amended Complaint* sought to deny Gemma's discharge under § 727(a)(4)(A) based on the alleged misstatement in Schedule B that Spoonful had no value. (*Amended Complaint* at ¶ 58.)  The *Joint Pre-Trial Order* expanded the § 727(a)(4)(A) allegations, but only to the limited extent of contending that Gemma understated her 2011 income in to Question # 1 in the SOFA.  The *Joint Pre-Trial Order* also included the additional contention that the Defendants understated their income in Schedule I and overstated their expenses in Schedule J.

"When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."  FED. R. CIV. P. 15(b)(2). A party may move to amend the pleadings to conform to the evidence, but the failure to make the motion does not affect the trial of that issue, *id.*, because it is the "duty of the court to consider issues raised by evidence received without objection even though no formal application is made to amend." *Lomartira v. American Auto. Ins. Co.*, 245 F. Supp. 124, 130 (D. Conn. 1965) (internal quotations omitted); *accord Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 603-04 (S.D.N.Y. 2007) (treating plaintiff's belated assertion of unpleaded claims in post-trial submission as a request to amend his complaint).  The court must consider whether the issue was tried by the parties' express or implied consent and whether the opposing party would suffer prejudice, "*i.e.*, whether he had a fair opportunity to defend and whether he could offer any

additional evidence if the case were to be retried on a different theory." *United States v. Certain Real Prop. & Premises Known as 890 Noyac Rd., Noyac, New York*, 945 F.2d 1252, 1257 (2d Cir. 1991) (internal citation and quotation marks omitted). "Usually, consent may be implied from failure to object at trial to the introduction of evidence relevant to the unpled issue." *Id.*; *Luria Bros. & Co. v. Alliance Assurance Co.*, 780 F.2d 1082, 1089 (2d Cir. 1986). However, failure to object to evidence that is relevant to *both pled and unpled* issues does not constitute implied consent to try the unpled issue absent "some obvious attempt to raise it." *890 Noyac Rd.*, 945 F.2d at 1257.

The Plaintiff never contended in the *Amended Complaint* or the *Joint Pre-Trial Order* that Gemma failed to list an asset in Schedule B, disclose payments to Amex within 90 days of the Petition Date or state in response to SOFA Question # 7 that she made a gift to the custodial account that she maintained for her son. In addition, the Plaintiff did not pursue or prove a case for piercing the corporate veil and did not contend in the *Amended Complaint* or *Joint Pre-Trial Order* that Gemma should have listed Got Cholent or Spoonful assets as her own in Schedule B.

Although the Plaintiff adduced evidence that Gemma (and Arieh) used Got Cholent's Amex credit card and other Got Cholent assets for their own benefit, that evidence was relevant to the Plaintiffs' argument that the Defendants had underreported their income in 2010 and 2011 because the benefits should have been imputed as personal income. The same was true of Gemma's use of Spoonful assets to pay family bills. There would have been no basis for Gemma to object to this evidence, and I conclude that her failure to list Got Cholent or Spoonful assets in Schedule B as her personal assets was never tried with her implied consent. Similarly, the Plaintiff has not pointed to any questions at trial relating to SOFA Question # 3 or

preferential payments made by Gemma to Amex, and I conclude that this issue was not tried with Gemma's implied consent.

I reach a different conclusion regarding SOFA Question # 7.  The Plaintiff's counsel directed Gemma's attention to her response to SOFA Question # 7 and asked her whether she had made the type of gifts or charitable contributions that had to be disclosed.  Gemma responded that she had not.  (Tr. (3/5) at 160:21-161:4.)  Counsel then confronted Gemma with the Charles Schwab custodial account statements and questioned her about whether she had deposited money into that account within the year preceding the Petition Date.  (Tr. (3/5) at 162:15-18.)  Gemma acknowledged that she had, but testified that she paid her son's school tuition from that account and denied that it was a gift.  (Tr. (3/5) at 162:21-163:9.)  Gemma's counsel never objected to this line of questioning, which continued on the second day of trial. (Tr. (3/20) at 6:2-8:2.)

Although the issues surrounding SOFA Question # 7 were tried with the implied consent of the parties, I conclude that the Plaintiff failed to prove that the deposits referred to by the Plaintiff were gifts or that they had to be disclosed.  During the year preceding the Petition Date, Gemma transferred the aggregate amount of $7,208.19 from her Schwab brokerage account to her Charles Schwab custodial account entitled "Gemma Sarah White Cust For Asher Elimelech White UNYUTMA Until Age 21", account number XXXX-1571.  (*See* PX Excerpt 38.)  Gemma testified that the custodial account was used solely to pay the day care and school fees of two of the Defendants' children, who were ages three and six at the time of trial.  (Tr. (3/20) at 3:15-20; 6:2-7; 18:10-17.)

Under New York law, the elements of an *inter vivos* gift are (1) a donative intent to make an irrevocable present transfer of ownership, (2) delivery of the gift to the donee and (3) acceptance by the donee. *Gruen v. Gruen*, 496 N.E.2d 869, 872 (N.Y. 1986). Gemma never intended to transfer these funds to her minor child outright. Furthermore, she did not deliver the funds to herself as custodian for the account beneficiary or accept them on his behalf. Instead, she used the funds to pay the children's current expenses. The result was no different than if she had paid these expenses directly from her brokerage account. For whatever reason, Gemma structured her school and daycare payments in this manner, but the transfers to the custodial account were not gifts and did not have to be listed in response to SOFA Question # 7.

This leaves the representation regarding her income. Initially, the Plaintiff did not adduce any evidence that Gemma misstated her income in Schedule I. Unlike SOFA Question # 1, which looks to the past, Schedule I asks the debtor to provide an "[e]stimate of average or *projected* monthly income at the time case filed." (Emphasis added.) Gemma listed $4,245.14 per month, or $50,941.68 annually, plus the $275 monthly contribution from her mother-in-law. (PX 3 at p. 28 of 49.) The Plaintiff did not argue that Gemma misstated her 2012 income or that the amount listed in Schedule B was an unreasonable estimate or deliberately untruthful.

Gemma also reported gross income in the sum of $50,000 for 2011 in response to SOFA Question # 1. Spoonful's amended 2011 tax return reported that its officers received $43,000 in compensation and Spoonful realized only $144 in net profits. (DX K.) The Defendants' 2011 tax returns contain the same information. (DX E at p. 7 of 24.) There is no explanation for how Gemma arrived at the $50,000 number, which was greater than her reported income, or whether it picked up any of the excessive bank deposits in 2011.

I nevertheless conclude that the 2011 income disclosure in response to SOFA Question # 1, even if wrong, should not lead to the denial of Gemma's discharge under § 727(a)(4)(A). As suggested earlier, Gemma was a poor but honest record keeper. Although her inadequate record keeping has led to the denial of her discharge under § 727(a)(3), which does not depend on her state of mind, the Plaintiff has failed demonstrate that the disclosure of her 2011 income, based on her poor record keeping, was made with fraudulent intent.

### 3.    The Joint Disclosures

The Plaintiff's contentions regarding the Defendants' "joint" disclosures have been addressed with one exception. The Plaintiff also contends that the Defendants overstated their child care expenses. Schedule J lists average or *projected* monthly "[n]ursery school/daycare/baby sitters expense" in the sum of $1,666.66. (PX 3 at p. 29 of 49 (line 13(c)).) Gemma had testified that she paid the daycare and school expenses for two of her three children from the Schwab custodial account. During the thirteen calendar months that encompass the one year preceding the Petition Date, Gemma disbursed $7,198.17 from the account, or an average of $599.85 per month.[16]

The Plaintiff did not ask any questions at trial about how the Defendants arrived at the amount listed in the Schedule J. Instead, the Plaintiff essentially asks me to infer that the discrepancy must be the product of fraud, but I decline to draw that inference because there are other plausible explanations. The disbursements from the Schwab account covered the nursery school and daycare for two of the Defendants' three children. They did not cover any

---

[16]    The starting balance in the account as of May 2, 2011 was $323.19. Gemma deposited $7,208.19 during the next year, and the balance in the account as of May 2, 2012, the Petition Date, was $333.21. (PX 38.) Thus, $7,198.17 was disbursed from the account, an average of $599.85 per month, during that period.

33

babysitting expenses or the prospective costs associated with the nursery school or daycare for their youngest child who was eighteen months of age on the Petition Date.  Schedule J also asks for average or projected expenses, and the amount reflected in Schedule J may be the projected expenses rather than the historical expenses.  Hence, the Plaintiff failed to prove that the estimated child-related expenses in Schedule J was a misstatement let alone a fraudulent one.

Accordingly, the Defendants are entitled to judgment dismissing Count III.  The Court has considered the parties' other arguments and concludes that they have either been rendered moot by the disposition of the case or lack merit.  Settle judgment on notice.

Dated:  New York, New York
      December 18, 2015

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge